In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2977

LORENZO ELLISON,

*Petitioner-Appellant,*

*v.*

GERARDO ACEVEDO,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02-CV-8546—**Joan B. Gottschall**, *Judge.*

ARGUED NOVEMBER 13, 2009—DECIDED JANUARY 28, 2010

Before KANNE and TINDER, *Circuit Judges*, and
GRIESBACH, *District Judge.*[1]

GRIESBACH, *District Judge.* On May 5, 1993, a Lake
County, Illinois jury found Lorenzo Ellison guilty of first-
degree murder in the death of Quincy King, a four-month-
old infant. He was sentenced to 60 years in prison. After

---

[1] Hon. William C. Griesbach, District Judge for the Eastern
District of Wisconsin, sitting by designation.

unsuccessfully appealing his conviction and the denial of a subsequent motion for post-conviction relief in the Illinois appellate courts, Ellison filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court denied Ellison's petition but issued a certificate of appealability on several issues, two of which have been briefed for appeal: (1) whether the failure of his trial attorney to consult with or call an expert witness on "shaken infant syndrome" constitutes ineffective assistance of counsel; and (2) whether the prosecutor's closing argument deprived Ellison of due process.[2] We find no deprivation of federal rights and affirm the district court's decision denying the petition.

## I. BACKGROUND

On November 20, 1992, at approximately 12:00 p.m., paramedics from the Waukegan Fire Department were dispatched to Ellison's apartment in response to a call that a baby (later identified as Quincy King) was not breathing. Quincy's mother, Jacqueline King, was

---

[2] The district court also granted a certificate of appealability on Ellison's claims that the State failed to prove his guilt beyond a reasonable doubt and that he was denied due process by the trial court's failure to change venue *sua sponte*, as well as other aspects of his ineffective assistance claim. This Court appointed counsel who has elected to pursue only the two issues noted above. The remaining issues are therefore forfeited. *Rodriguez v. United States*, 286 F.3d 972, 977 n.3 (7th Cir. 2002).

involved in a romantic relationship with Ellison and had moved into his apartment with Quincy and her other two children on October 30, 1992. A third adult, Roberto Smith, was also staying with Ellison at the time. Upon their arrival, paramedics found Quincy lying motionless on a bed in the apartment with his eyes closed. Ellison told paramedics that he had been playing with the baby by throwing him up in the air when he stopped breathing.

The paramedics transported Quincy to the hospital where he was examined by Dr. Thomas Glimp. Dr. Glimp noted that Quincy was not breathing, had no pulse, and had a bruise on his left cheek. The "soft spot" on Quincy's skull was firm and bulging, indicating pressure or fluid in the skull. Dr. Glimp asked Ellison what happened, and he again stated he had been tossing the baby in the air when the baby stopped breathing. Thinking that the explanation did not square with Quincy's injuries and that the child was the victim of shaken infant syndrome, Dr. Glimp notified hospital staff who contacted the Department of Children and Family Services. Quincy was then transported to another hospital where he was pronounced dead the next day. A subsequent autopsy confirmed that the cause of death was blunt force injury to the brain associated with shaken infant syndrome.

Ellison was interviewed by Sergeant Fernando Shipley and Detective Donald Meadie of the Waukegan Police Department the night after Quincy was taken to the hospital. Ellison gave two statements: one in his own handwriting, and a second that Detective Meadie typed and Ellison signed. In both statements, Ellison admitted

that he was bouncing Quincy on the bed before he stopped breathing, but added that he had also shaken him when he started crying. In his handwritten statement, Ellison wrote:

> I started to play with Quincy and throw him up in the air and bounced him on the bed and he started to cry and I shook his face to keep him from crying and don't know how hard I shook his face and bounced him on the bed and Bob [Roberto Smith] gave him CPR and I called 911 emergency and I don't see him breathing.

The typewritten statement Ellison signed likewise describes shaking the child, as well as bouncing him on the bed:

> The last time I bounced Quincy on the bed, he fell away from me, and that was when I grabbed him with both hands around his head to prevent him from falling off the other side. I was trying to get Quincy to stop crying, so I started shaking him, but I guess I shook him too hard.

According to the detectives, Ellison also demonstrated for them how he had shaken Quincy by moving both hands back and forth in a "vigorous motion."

Ellison was thereafter charged with one count of first-degree murder and arraigned on December 15, 1992. At an early pretrial conference on January 27, 1993, Ellison's retained counsel, Attorney Seymour Vishny, indicated he was in the process of obtaining an expert but would need three to four weeks to do so. It appears, however,

that Attorney Vishny was under the impression that either Ellison or his family would have to pay for an expert, and he reported at a pretrial conference on February 11 that he was having difficulty getting the family to cooperate. The trial court explained that there were other options that were not dependent on family resources and continued the case for the following week. By that time, Ellison's family had retained Attorney Robert Pantoga to replace Attorney Vishny, and the case was again continued for another week.

On February 24, the court set the matter for trial on April 26, 1993. On March 31, Attorney Pantoga asked the court to continue the trial date for another week so that he could review the resumes of the State's experts and obtain his own. The trial court granted the request, and at the final pretrial conference on April 14, Attorney Pantoga made no mention of an expert. No further requests for a continuance were made, and the trial commenced, as scheduled, on May 3, 1993.

At trial, Dr. Glimp testified to his observations when Quincy arrived at the emergency room, and Sergeant Shipley and Detective Meadie told of their interview with Ellison and recounted his statements to them. Dr. Jeffrey Jentzen, the forensic pathologist who performed the autopsy on Quincy, also described his findings.

Dr. Jentzen noted there were bruises on the right and left cheeks, and a scabbed-over quarter-inch laceration on the back of Quincy's head. Four of Quincy's right ribs showed healing fractures that were three to four weeks old. He also noted that there were recent rib frac-

tures on both the left and right sides, with the left-side fractures on the back. He opined that the recent fractures occurred within a few days of Quincy's death. Quincy also had a depressed skull fracture and multiple blood clots in his skull. The corpus callosum, which is the band of tissue connecting the right and left halves of the brain, had been lacerated, and each of Quincy's eyes had multiple hemorrhages. Quincy had a large blood clot near his spinal cord, corresponding to the fractured ribs on his left side. With the exception of the old rib fractures and the scalp laceration, Dr. Jentzen opined that all of Quincy's injuries occurred at the same time.

Based on his examination, Dr. Jentzen concluded that Quincy died as a result of shaken infant syndrome. Dr. Jentzen explained that shaken infant syndrome refers to "a group of findings or injuries that occur when a child is violently shaken." According to Dr. Jentzen, the child is typically grasped in the chest area and the ribs next to the spine fracture from the pressure of squeezing the child. Because an infant's bones are more elastic than those of an adult, "a large amount of force" was needed to fracture them. The blood clots in the skull are the result of the child's brain violently striking the inside of his skull as he is shaken back and forth, a sort of "whiplash phenomenon" that occurs because the child's neck muscles are not sufficiently developed to support his head while he is being shaken. The corpus callosum, ruptures when the brain twists and turns, and the supporting structures can no longer support the brain. Dr. Jentzen testified that this type of rupture typically also occurs in motor vehicle accidents and

falls from great heights. Hemorrhages in the eyes occur when the shaking causes the blood vessels in the eyes to separate. Death occurs when the injured brain tissue swells.

According to Dr. Jentzen, Quincy would have had to have been "violently shaken" to cause the injuries he observed. Based on his experience in such cases and discussions with colleagues, Dr. Jentzen stated that individuals who cause such injuries "typically shake a child until they describe their arms as being tired." Given the nature and extent of the more recent injuries he observed, Dr. Jentzen also thought that the person who caused them "would have had to have known that the child was severely injured. The child would most probably have been comatose or semi-comatose, there would have been irritability, there would have been evidence of injury."

In addition to these witnesses, each of the adults who were present in the apartment when Quincy stopped breathing testified to the events leading up to his death. Jacqueline King, Quincy's mother, testified that the night before her son died she was sleeping with Ellison in his bedroom, while Quincy slept on a pallet on the floor next to Ellison. Between three and four o'clock in the morning, Quincy began to "holler" and would not go back to sleep. Ellison offered him a bottle and pacifier, but the child wouldn't take them. In King's words, Ellison "turned over and he did a little shove like, 'shut up, boy. I got to go to sleep.'" Quincy quieted down, but started up again "as soon as Lorenzo stopped

shaking him . . . ." At that point, King testified that she got out of bed and sat on the floor with Quincy until he went to sleep.

When Quincy woke up the following morning, King testified that he appeared normal to her. Sometime around 11:30 a.m. Ellison and Smith began tossing Quincy in the air and letting him fall onto the bed. Quincy looked "scared" and was "whining," and King asked them to stop, but they did not. King then went into the bathroom to change her three-year-old daughter's clothes because she had wet herself. While she was in the bathroom, King, who was deaf in one ear and had the water running, was unable to hear what was going on in the bedroom. When she returned to the bedroom, Smith told her Quincy was not breathing. Smith began performing CPR, and Ellison called the rescue squad.

King also testified that she had previously observed Ellison and Smith tossing Quincy and had told them to stop because they could hurt him. Ellison, on one occasion, replied that he would not hurt Quincy because "he cared for him like he's his own." About two weeks prior to Quincy's death, King stated she saw Ellison shaking and punching Quincy in the chest with his fists. King testified that when she asked Ellison to stop, he replied that he was not hitting Quincy hard enough to hurt him, and that he was hitting the baby to "make him tough."

Smith, who was called by the defense, also denied he was in the bedroom when Quincy stopped breathing. Smith testified that he left the apartment earlier that

morning and arrived back at approximately 11:30 a.m. He admitted that he was bouncing the child on the bed with Ellison when he first entered the apartment, but then left the bedroom to take off his coat. When he left the room, Smith stated that Quincy seemed fine. When he came back about five minutes later, Quincy was not breathing. On cross-examination, Smith added that after he left the bedroom, he heard the baby crying and Ellison say "shut up" a few times. Then "it got silent."

Finally, Ellison testified on his own behalf. At one point, he said that all three of the adults were in the bedroom when Quincy suddenly blacked out. Yet, he also said that Smith told King that Quincy stopped breathing when she returned from the bathroom. Notwithstanding his two statements to police, Ellison also denied that he had ever shaken Quincy. He claimed police had pressured him into signing the typewritten statement and then into writing the other statement, using the first as a model. Ellison also claimed that while he was present, no one shook the baby.

The jury was instructed on both first-degree murder and the lesser-included offense of involuntary manslaughter. Toward the end of his closing argument, the prosecutor addressed the question of Ellison's mental state, stating:

> . . . the issue is the mental state of the defendant at the time the acts were performed that killed the child, not the mental states in the past by Jacqueline King, not by Roberto Smith. These people are not on trial here today. What we have here is one defendant on trial.

If those other people had caused the death of this child, if they had shaken this child so hard that he died, they would be on trial with the defendant.

Counsel for Ellison objected, and the trial court sustained the objection. The prosecutor continued: "They did not commit any acts to kill this child. They did not do any acts to cause the death of this child. He did." Counsel again objected, but this time the trial court overruled the objection.

No request was made either for a mistrial or a curative instruction. The attorneys completed their closing arguments, and the jury retired for its deliberations. Upon completion of its deliberations, the jury returned a verdict finding Ellison guilty of first-degree murder. Ellison was sentenced to sixty years in prison on June 4, 1993.

Ellison appealed his conviction claiming, *inter alia*, that his trial counsel was ineffective for failing to investigate and obtain an expert witness to testify on shaken infant syndrome. The Illinois Appellate Court, Second District, rejected the claim because Ellison had made no showing that an expert could have offered any testimony that would have helped the defense. The Illinois Supreme Court denied Ellison's petition for leave to appeal on June 5, 1996.

Ellison next filed a pro se state petition for post-conviction relief in which he claimed that he had been denied due process and a fair trial by the prosecutor's allegedly prejudicial and inflammatory statements during closing arguments. The post-conviction court appointed counsel

to represent Ellison, and counsel filed an amended petition that incorporated this ground, and additionally repeated the argument that trial counsel was ineffective for failing to present expert testimony on the issue of shaken infant syndrome. The amended petition was supported by an affidavit of Dr. Stephen Lazoritz, which states in relevant part:

> It is my opinion, within reasonable medical certainty, that the exact force needed to injure or kill an infant by shaking, though very great, is not exactly known. The statement that the perpetrator would have had to shake the infant until his arms were exhausted is purely speculative. The exact number of shakes required or the time required has not been determined, only the fact it requires a great force.

The court held an evidentiary hearing on the ineffective assistance of counsel issue on March 27, 2000, but Ellison was the only witness; neither Dr. Lazoritz nor Attorney Pantoga testified. Ellison testified that both Attorney Vishny and Attorney Pantoga told him it would be necessary to hire an expert witness and asked his family for money to hire an expert. He testified that Attorney Pantoga never consulted with or hired an expert, but claimed that Attorney Pantoga did ask the trial court for additional time to retain one. According to Ellison, the court refused his request.

The court denied Ellison's petition for post-conviction relief in a written decision issued on December 15, 2000. As to the claim that his trial attorney was ineffective for failing to retain and call an expert, the court found that

Ellison had still not offered any evidence that an expert would have helped the defense. The court recognized that, according to his affidavit, Dr. Lazoritz thought Dr. Jentzen's statement that the perpetrator shook the child until his arms were tired was purely speculative. The court noted, however, that this testimony came at the end of Dr. Jentzen's direct examination. Dr. Jentzen had stated that based on his experience and discussions with his colleagues, it seemed to him that individuals will typically shake a child "until they describe their arms being tired." He was then asked the following leading question: "So what you are telling us, Doctor, is that this baby was shaken until the person who was shaking him, his arms hurt, and that's what stopped him from shaking this baby?" Defense counsel did not object, and Dr. Jentzen responded, "Probably."

In denying the petition, the court concluded that Dr. Lazoritz's affidavit "in no way refutes" Dr. Jentzen's opinion "that the child 'was violently shaken.'" In fact, the court concluded that Dr. Lazoritz's affidavit "actually supports the State's case further with his opinion that it requires 'great force' to kill or injure an infant by shaking." The court also concluded that even if an objection had been made and sustained to the challenged testimony, or an expert had been called to refute it, it would not have changed the result. "That testimony did not alter the underlying testimony of Dr. Jentzen as to his opinion concerning the cause of death, the observable injuries, the nature of shaken baby syndrome, and the force necessary to kill or injure an infant by shaking."

As to Ellison's claim that his due process rights were violated by the prosecutor's improper statements during closing argument, the court held that "the closing argument comments were adequately dealt with by the trial judge and even if some of them were improper, they would not have affected the result or prejudiced the defendant to such an extent that a new trial would be required."

A new attorney was appointed to represent Ellison on the state post-conviction appeal, but moved to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), on the ground that there was no claim that merited review. As to the ineffective assistance claim, counsel noted that Dr. Lazoritz's affidavit did not state that he would have been available to testify at Ellison's trial, and in any event, Dr. Lazoritz did not dispute Dr. Jentzen's testimony that it took "great force" to kill an infant by shaking him, only the length of time it would take. As to the due process claim, counsel stated that the prosecutor's statements during closing argument were "fair comments." The Illinois Appellate Court granted the motion to withdraw, stating there were no meritorious issues that would support an appeal, and affirmed the order denying Ellison's petition for post-conviction relief. The Illinois Supreme Court denied his petition for leave to appeal.

Ellison then filed his petition for federal habeas relief under 28 U.S.C. § 2254, in which he raised numerous issues in addition to those certified to this court for appeal. By decision dated June 13, 2008, the district court

denied the petition. In denying his claim of ineffective assistance of counsel, the district court concluded that Ellison had failed to show that an expert would have been available at the time of the trial who would contradict the prosecution expert's testimony, or at least the state court's finding to that effect was not unreasonable. As to the due process claim, the district court held that Ellison had failed "to provide specific reasons or to cite any precedent as to why these remarks were so improper (and the Illinois courts' rulings on them so unreasonable) as to deny him due process." This appeal followed.

## II. DISCUSSION

### A. AEDPA Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs review of state court convictions in federal habeas corpus proceedings. Under AEDPA, a federal court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 376 (2000). A state court decision is "contrary to" federal law if the state court either incorrectly laid out governing United States Supreme Court precedent, or, having identified the correct rule of law, decided a case differently than a materially factually indistinguishable Supreme

Court case. 28 U.S.C.A. § 2254(d)(1); *Calloway v. Montgomery*, 512 F.3d 940, 943 (7th Cir. 2008). An "unreasonable application" of United States Supreme Court precedent occurs when a state court identifies the correct governing legal rule but unreasonably applies it to the facts of a case or if the state court either unreasonably extends a legal principle from the Supreme Court's precedent to a new context in which it should not apply or unreasonably refuses to extend that principle to a new context in which it should apply. 28 U.S.C.A. § 2254(d)(1); *Muth v. Frank*, 412 F.3d 808, 814 (7th Cir. 2005). We review *de novo* the district court's denial of a habeas petition. *Southerland v. Gaetz*, 581 F.3d 614, 616 (7th Cir. 2009) (citing *Ben-Yisrayl v. Buss*, 540 F.3d 542, 546 (7th Cir. 2008)).

**B. Ineffective Assistance of Counsel**

Ellison's claim that the assistance provided by his trial counsel fell below Sixth Amendment standards is governed by the familiar two-part test "clearly established" by the Supreme Court in *Strickland v. Washington*:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

> Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. 668, 687 (1984).

Even before AEDPA was enacted, the Court cautioned that, in applying this test, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Post AEDPA, the bar is even higher. *See Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir. 1997) ("*Strickland* builds in an element of deference to counsel's choices in conducting the litigation; § 2254(d)(1) adds a layer of respect for a state court's application of the legal standard.").

Likewise with respect to the prejudice prong of the *Strickland* analysis, on direct review a defendant must show that he was prejudiced by counsel's deficient performance, i.e., he must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. On federal habeas review, however, the question is whether the state court's determination that such a probability does not exist is reasonable. *Barrow v. Uchtman*, 398 F.3d 597, 605-06 (7th Cir. 2005).

Ellison argues that the state court misapplied *Strickland* in denying his motion for post-conviction relief. His

attorney "failed to call an expert to rebut key testimony at his trial," he contends, "not because he did not believe one was necessary or because one was not available, but because, in an overly rushed pre-trial process, he failed to make an investigation, and he misunderstood his ability to rebut the state's expert in alternative ways." Brief of Petitioner-Appellant at 31. Expert testimony as to the force needed to kill a child by shaking him was essential to his defense, Ellison maintains. The state court's decision to the contrary was an unreasonable application of clearly established law. *Id.*

The record does not support Ellison's contention that Attorney Pantoga failed to call an expert because he did not understand the potential benefit of a defense expert or how to go about retaining one for an indigent client.[3] Nor does it support the suggestion that he was prevented from doing so by "an overly rushed pre-trial process." Ellison did not call Attorney Pantoga as a witness at the hearing on his petition for post-conviction relief, so the record does not contain his explanation.

---

[3] Attorney Vishny's understanding of his obligations is not at issue since he was replaced by Attorney Pantoga before trial. As noted above, however, before he was replaced by Attorney Pantoga, the trial court explained to Attorney Vishny that his ability to retain an expert was not dependent on the resources of his client or his family. Moreover, prior to being replaced, Attorney Vishny filed a petition to have his client declared indigent. There is no reason to believe that Attorney Pantoga was not similarly aware of Ellison's right to retain an expert, if he thought one was necessary, at public expense.

What the record does reflect is that Attorney Pantoga said he intended to retain an expert and even requested a brief adjournment of the trial to allow time for him to do so. The trial court granted his request, and Attorney Pantoga never raised the issue again. This is hardly evidence that he failed to investigate or did not understand how an expert might help.

Of course, even if the failure to call an expert was not due to the attorney's ignorance or the trial court's insistence on an early trial, such failure may still constitute ineffective assistance. If the need for an expert was clear and one was reasonably available, counsel should at least consult with one. *See Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001) ("[I]n the circumstances (an essential qualification), there was also no excuse for the lawyer's failure to consult experts on hair, DNA, treadmarks, and footprints."). By itself, however, the absence of a defense expert is not sufficient to establish that counsel's performance was deficient. For counsel's performance to be found deficient, the defendant must demonstrate that an expert capable of supporting the defense was reasonably available at the time of trial. The state court concluded that Ellison had failed to make such a showing. The question we must decide is whether the state court's conclusion was unreasonable.

The only evidence Ellison offered in support of his claim that such an expert was available was the affidavit of Dr. Lazoritz, signed more than six years after the trial, which disputed Dr. Jentzen's testimony that Ellison had probably shaken Quincy until his arms were tired.

Ellison's Amended Petition for Post-Conviction Relief states that Dr. Jentzen's testimony in this regard "is contrary to the opinions of the medical community in the area of Shaken Baby Syndrome *today* as expressed in Dr. Lazoritz's affidavit." (italics added). On its face, this evidence is insufficient to show that an expert capable of refuting Dr. Jentzen's testimony was available in May 1993. Even aside from the date of the affidavit, however, the state court concluded that the proffered evidence did not show that Attorney Pantoga's failure to call an expert amounted to ineffective assistance. The plain fact recognized by the court is that on the central question of the degree of force that would be needed to kill or even injure a child by shaking him, Dr. Lazoritz was in agreement with Dr. Jentzen—"very great" force was needed. Why call an expert to emphasize the key point the prosecution wanted to convey to the jury?

Of course, we recognize that the aspect of Dr. Jentzen's testimony on which Ellison claims an expert could have provided assistance is not on the degree of force needed to cause Quincy's death, but the amount of effort the perpetrator would have had to exert. It is Dr. Jentzen's testimony that people who shake infants to death typically continue shaking until their arms are tired that Ellison contends an expert could have refuted. But this testimony was simply Dr. Jentzen's picturesque, and likely inadmissible, way of conveying his central point, namely, that it took a lot of force to shake the child enough to cause the injuries he observed, a point with

which Dr. Lazoritz was in full agreement.[4] There is no evidence that prior to trial, when Attorney Pantoga presumably considered the possibility of retaining an expert, he had any reason to believe the prosecution would offer such testimony at trial. Under these circumstances, the state court's determination that the failure to retain an expert witness did not constitute deficient performance of counsel's duty to effectively represent his client was a reasonable application of *Strickland*.

The same is true of the state court's determination that Ellison suffered no prejudice from his attorney's failure to call an expert to refute the challenged testimony. The jury was instructed that "a person commits the offense of first-degree murder when he kills an individual without lawful justification if, in performing the acts which caused the death, he knows that such acts create a strong probability of great bodily harm to that individual." *See* Ill. Rev. Stat. 1991 ch. 38, par. 9-1, *now codified at* 720 Ill. Comp. Stat. 5/9-1. Thus, in order to find

---

[4] The precise testimony at issue is likely inadmissible because it is vague and without foundation. The amount of shaking needed to tire a perpetrator's arms obviously varies, depending on the physical condition of the perpetrator. It is hardly a standard that could be considered scientifically established. *See People v. Mehlberg*, 618 N.E.2d 1168, 1190-91 (Ill. App. 1993) (noting that Illinois follows the *Frye* test, under which scientific evidence is not admissible unless technique has gained acceptance within relevant scientific community). There is also no indication of how many perpetrators have confessed their feelings of fatigue to Dr. Jentzen and his colleagues.

Ellison guilty, the jury had to have first found that he performed the acts that caused Quincy's death, and the only remaining question would have been whether he knew his acts created a strong probability of great bodily harm to Quincy. Dr. Jentzen testified that in order to cause the injuries he observed, the child must have been "violently shaken." Even Dr. Lazoritz believed that the amount of force needed to injure or kill an infant by shaking was "very great" and Ellison himself admitted that he knew that Quincy was "so fragile" and "could be hurt easily." Thus, Ellison's defense rested on the proposition that he did not know that shaking a fragile four-month-old infant "violently" or "with great force" would create a strong probability of great bodily harm. In light of the evidence and given the *mens rea* element of the crime, we cannot say that the state court's determination that a defense expert would not have changed the result constitutes an unreasonable application of *Strickland*. We therefore affirm the district court's decision denying Ellison's petition based on ineffective assistance of counsel.

## C. Due Process

Ellison also claims that a portion of the state prosecutor's closing argument was so improper as to constitute a violation of his Fourteenth Amendment right to due process of law. Ellison contends that the prosecutor argued in his closing that he was guilty of first-degree murder based on the mere fact that he was charged with the crime. He also contends that the prosecutor expressed his personal opinion about his guilt.

Under the circumstances of this case, Ellison argues, these comments deprived him of a fair trial and due process of law. The state court's conclusion to the contrary, he contends, constitutes an unreasonable application of the Supreme Court's decision in *Darden v. Wainright*, 477 U.S. 168 (1986).

*Darden* established a two-prong test for determining whether a prosecutors' comments in closing argument constitute a denial of due process. *Id.* at 181; *Bartlett v. Battaglia*, 453 F.3d 796, 800 (7th Cir. 2006). The court must first look to the challenged comments to determine whether they were improper. If the comments were improper, the court must consider a number of factors to determine whether the defendant was prejudiced by the comments. *Ruvalcaba v. Chandler*, 416 F.3d 555, 565 (7th Cir. 2005). Among the factors to be considered by the court in deciding whether the defendant was prejudiced by the comments are: "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut." *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000). In determining whether the prosecutors' remarks were prejudicial, however, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal quotations and citations omitted).

In our view, the state court's decision rejecting Ellison's claim was not an unreasonable application of *Darden*. Viewed in context, it is not even clear the remarks of the prosecutor were improper. Even if they were improper, however, the state court reasonably determined that they were not so egregious as to deprive Ellison of due process.

In assessing the meaning and intent of the prosecutor's remarks, it is first necessary to place them in context. Ellison's primary defense was that he lacked the requisite intent for first-degree murder. In his opening statement, his attorney told the jury that the evidence would show that Quincy's "death was a result of reckless, negligent acts by several named and unnamed persons," and that "all the adults in the house at that time were neglectful of this baby's frailty, by the rough play or by the total stupidity." It was this suggestion that Ellison was no more culpable than King and Smith, and that all had acted without intent to harm the child, that the prosecutor was attempting to address when Attorney Pantoga objected. The pertinent portion of the transcript reads:

> [Prosecutor]: This is not a case about recklessness. There were reckless acts before this baby died certainly. But the issue is the mental state of the defendant at the time the acts were performed that killed the child, not the mental states in the past by Jacqueline King, not by Roberto Smith. These people are not on trial here today. What we have here is one defendant on trial. If those other people had caused

the death of this child, if they had shaken this child so hard that he died, they would be on trial with the defendant.

[Mr. Pantoga]: Objection.

[Prosecutor]: But they didn't do so.

[The Court]: Sustained.

[Prosecutor]: They did not commit any acts to kill this child. They did not do any acts to cause the death of this child. He did.

[Mr. Pantoga]: Objection, Judge.

[The Court]: Overruled.

[Prosecutor]: He did. And that's why he's on trial here. This was a voluntary act on his part, not some involuntary act where he didn't know what he was doing.

Viewed in context, it is clear that the prosecutor was not arguing that Ellison was guilty because he was charged. Instead, he was trying to make the point that it was Ellison's mental state that was at issue in the case, not Smith's or King's, because it was Ellison's actions that, in the view of the prosecution, caused Quincy's death. The prosecutor was telling the jury that it was to determine Ellison's state of mind, his intent, while he was shaking Quincy. Unlike Ellison, neither Smith nor King had admitted to shaking the child, the undisputed cause of death, and thus neither had been charged with the crime. They were not accused of having taken the actions that caused Quincy's death, and thus their intent was irrelevant. This was apparently why Ellison's

previous appellate counsel reported in his *Anders* brief to the Illinois Appellate Court that the prosecutor's remarks were "fair comment on the evidence."

Because the prosecutor's argument was unclear and arguably susceptible to the improper meaning Ellison has attached to it, the trial judge nevertheless sustained the objection Attorney Pantoga interposed. Thus, to the extent that the jurors may have understood the prosecutor's remarks as implying that Ellison was guilty simply because he had been charged with a crime, the trial judge's ruling on the objection alerted them that the statement should be ignored, just as any question to which an objection was sustained should be ignored. *See Clark v. Fike*, 538 F.2d 750, 759 (7th Cir. 1976) ("Although it is always improper for the prosecution to suggest that a defendant is guilty from the mere fact that he is being prosecuted, in this context with part of the comment stricken and the other part made in response to defense assertions, we cannot say that the comment deprived the petitioner of a fair trial."). The jury was also instructed that the indictment charging the defendant with a crime was not evidence against the defendant and did not create any inference of guilt, that the defendant was presumed to be innocent of the charges against him, and that the opening statements and closing arguments of the attorneys were not evidence. These instructions would likewise have disabused the jury of any confusion the prosecutor's comments may have caused.

We also note that even though counsel had not asked for a curative instruction on the issue, the prosecutor in

essence provided such an instruction himself. Immediately following the comments quoted above, the prosecutor continued:

> Yes, this defendant, like all defendants in all cases, is presumed to be innocent of the charge, and it's our burden to prove him guilty. We have accepted that burden from the beginning of the case because he is guilty. If you look at him, you think about that presumption of innocence he has. Just look at him and think about that presumption of innocence. And when you look at him, think about that presumption of innocence, also look at him and think about having a baby in his hands. And think about him being mad at that baby, and think about him starting to shake that baby, and shake it and shake it, and saying "shut up, shut up." Is he still innocent as he sits there, if you think about him with that baby in his hands? No, he's not innocent. And it's not me that says he's not innocent, it's not me that says he's guilty; it's the evidence that points at Lorenzo Ellison that says he's guilty. And for that reason I ask you to find him guilty of this crime.

In other words, the prosecutor made clear to the jury that he was not arguing that Ellison was guilty because he had been charged, but because the evidence proved his guilt.

Finally, to the extent the potential confusion caused by the prosecutor's remarks remained even after the court's ruling and instructions, Ellison's counsel had an adequate opportunity during his rebuttal argument to

counter them. The fact that he did not even address them suggests that he understood by that time that the argument was neither misleading nor improper. Under these circumstances and considering the evidence against him, the state court did not unreasonably apply *Darden* in rejecting Ellison's claim that the prosecutor had violated his due process rights by improperly arguing that he was guilty merely because he was charged with a crime.

The last-quoted comments also belie Ellison's contention that the prosecutor improperly asserted his personal opinion of Ellison's guilt, as opposed to his view of what the evidence established. It is, of course, improper for a prosecutor, or a defense attorney for that matter, to interject his or her personal opinion of the defendant's guilt. *United States v. Young*, 470 U.S. 1, 17 (1985). Although the line between what an attorney submits the evidence establishes and what he personally thinks of the guilt of the defendant may sometimes seem artificial, the rule is both "elemental and fundamental." *Greenberg v. United States*, 280 F.2d 472, 475, n. 4 (1st Cir. 1960), *quoted in United States v. Wasko*, 473 F.2d 1282, 1284 (7th Cir. 1972). The purpose of the rule is to insure that the jury will base its verdict on the force of the evidence and not the personal opinion of an attorney or his office, and to avoid any suggestion that the attorney has "insider knowledge" of the case. *Wasko,* 473 F.2d at 1283-84. Here, there was no appeal to the prosecutor's personal opinion; to the contrary, he urged the jury to find the defendant guilty because the evidence "says he's guilty." "We decline to adopt the defendant's

curious view that it is improper for the prosecutor to argue to the jury that a defendant is guilty." *United States v. Auerbach*, 913 F.2d 407, 418 (7th Cir. 1990).

### III. CONCLUSION

The record does not support Ellison's contention that the Illinois courts unreasonably applied clearly established federal law in rejecting either of his claims. Accordingly, the district court's decision denying his petition for a writ of habeas corpus is AFFIRMED. We thank Attorneys Jacqueline F. Gharapour and Lindsey Beyer for their service as court-appointed counsel for Appellant-Petitioner on this appeal.