2023 IL App (1st) 220020-U

No. 1-22-0020

Order filed November 9, 2023

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 17 CR 60141 |
| | ) | |
| CLARENCE DUNNER, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE NAVARRO delivered the judgment of the court.
Justices Mikva and Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's convictions for attempted murder, aggravated battery and unlawful use or possession of a weapon by a felon over his contentions that there was insufficient evidence to convict him of the offenses, the State failed to prove a chain of custody for certain evidence, the State made improper references about his failure to testify and argued facts not in evidence during closing argument, and his defense counsel provided ineffective assistance by failing to file a motion to quash his arrest and suppress the evidence therefrom.

¶ 2    Following a jury trial, defendant Clarence Dunner was found guilty of attempted murder, aggravated battery, and unlawful use or possession of a weapon by a felon. The trial court

subsequently sentenced him to 50 years' imprisonment for attempted murder, which included a 25-year enhancement for personally discharging a firearm that proximately caused great bodily harm, 6 years' imprisonment for aggravated battery, and 14 years' imprisonment for unlawful use or possession of a weapon by a felon. His sentences for attempted murder and aggravated battery ran consecutively while his sentence for unlawful use or possession of a weapon by a felon ran concurrently for a total sentence of 56 years' imprisonment. On appeal, defendant contends that: (1) there was insufficient evidence to convict him of the offenses; (2) the State failed to prove a chain of custody for certain evidence; (3) the State made improper references about his failure to testify during closing argument; (4) the State argued facts not in evidence during closing argument; and (5) his defense counsel provided ineffective assistance by failing to file a motion to quash his arrest and suppress the evidence therefrom. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      A grand jury indicted defendant on multiple counts of attempted murder and aggravated battery for allegedly shooting Michael Williams and Rosie Logan with a firearm as well as one count of unlawful use or possession of a weapon by a felon.

¶ 5      At defendant's jury trial, the evidence showed that, at approximately 12:40 a.m. on June 2, 2017, Aleatha Harris was sitting in her vehicle in an alley near North Ashland Avenue and West Jonquil Terrace in Chicago. Harris was talking to her boyfriend, Michael Williams, who was standing outside her vehicle. Suddenly, Harris and Williams heard several gunshots, causing both to take cover. Harris observed the shooter reach over her vehicle and shoot at Williams. As a result of the gunfire, Williams was shot three times. Harris described the shooter as male and thought he was wearing a tan shirt. Williams described the shooter as a Black male wearing a dark jacket. Neither had a clear view of the shooter's face. When the shooting stopped, Harris called 911.

¶ 6    Moments after the shooting ended, William Riley, who lived on the third floor of nearby condominium building, went to his window. He observed a man running around a corner and "ducking" into either an entryway or courtyard of a residential building on North Greenview Avenue. Riley did not see the face of the man, did not see a firearm and could not describe his clothing, but this was the only person he observed running in the area. Seconds later, as Riley was still looking out of his window, several police officers arrived on the scene, including Officer Gregory Stranski. Riley caught Officer Stranski's attention and pointed him in the direction Riley observed the man running. Officer Stranski began to search various courtyards and gangways along that block of North Greenview Avenue, but could not locate anyone. Other officers also arrived on the scene to help, including Officer Kevin Ward, who searched a courtyard protected by a gated wrought iron fence.[1] From outside the courtyard, he spotted defendant crouching down "as if trying to hide his face" inside the courtyard. Officer Stranski subsequently detained him.

¶ 7    While Officer Stranski detained defendant, Officer Ward found a black handgun with an extended magazine in a fenced-in area of plants along the walkway leading to the courtyard. According to Officer Stranski, the firearm was about six feet from where defendant was found. At trial, Officer Ward identified People's Exhibit No. 15 as a photograph of the "black handgun." That exhibit as well as all of the other admitted exhibits were not included in the record on appeal. Officer Ward remained with the firearm until Officer Sergio Glowacki, an evidential technician, arrived. Officer Glowacki photographed the firearm and recovered it. During his trial testimony, Officer Glowacki identified People's Exhibit No. 17A as the firearm he recovered. After recovering the firearm, Officer Glowacki relocated a couple blocks away and recovered 12 fired

---

[1] By the time of trial, Officer Ward had been promoted to detective. To avoid confusion, however, we will refer to him as Officer Ward throughout.

cartridge casings as well as a fired bullet and bullet fragments. Meanwhile, Officer Stranski placed defendant into a police wagon in order to keep him on the scene for a show-up.

¶ 8 Officer Daniel Vo also arrived on the scene after the shooting, where he discovered Williams covered in blood on the ground. After an ambulance arrived to treat Williams, an unknown citizen directed Officer Vo to an apartment building a half-block away, where he observed Rosie Logan with a gunshot wound to her arm. Logan had been shot through a window in her apartment. Thereafter, medical personnel arrived to treat Logan, and ambulances transported her and Williams to the hospital. According to Officer Vo, the initial description of the shooter was a Black male with a blue hooded sweatshirt. Following the show-up, according to Officer Stranski, he arrested defendant. During Officer Stranski's testimony, the State introduced and admitted into evidence People's Exhibit Nos. 6 and 7, which were photographs of defendant on the night of the shooting. Once defendant arrived at the police station, he began screaming and complaining of pain, resulting in him being transported to a hospital.

¶ 9 During the investigation of the shooting, Detective Abdalla Abuzanat collected surveillance video from near the scene. During Detective Abuzanat's testimony, the State introduced and admitted into evidence People's Exhibit No. 50, which was a DVD containing six surveillance videos. The State played those videos for the jury. Detective Abuzanat testified that, in one of the videos, a subject could be seen running on West Jonquil Terrace toward North Greenview Avenue. Later, Detective Abuzanat went to the police station and collected a "hooded sweater" from defendant, which he identified at trial as People's Exhibit No. 51. Detective Abuzanat collected the hooded sweatshirt, in part, for gunshot residue testing. Although he testified at trial that the police could perform a gunshot residue test on a suspect's hands, they did not perform one on defendant's hands because too much time had elapsed from the time of the

shooting until defendant returned from the hospital. A forensic scientist with the Illinois State Police examined the hooded sweatshirt and determined that its right cuff tested positive for gunshot residue. Forensic testing of the firearm, the extended magazine and the ammunition did not reveal any fingerprints suitable for comparison. Additionally, the firearm had DNA from at least three different people, but the mixture was not suitable for comparison. Ballistics testing of the firearm revealed that all 12 fired cartridge casings found at the scene of the shooting came from the gun recovered near defendant.

¶ 10    A week after the shooting, David Colon, an acquittance of defendant, received two phone calls from him, which were recorded. During Colon's testimony, the State introduced and admitted into evidence People's Exhibit No. 49, which were the recordings of the phone calls. The State played the recordings for the jury, and Colon testified that, based on the conversation, he believed defendant wanted him to provide defendant with an "alibi" for the night of the shooting.

¶ 11    Williams remained at the hospital for three weeks with several injuries, including a shattered spine and nerve damage to his left leg. One of the bullets remained lodged in his right hip. Williams remained wheelchair-bound for several months after the shooting. By the time of trial, Logan had passed away. At the conclusion of the State's case, the parties stipulated that defendant had been previously convicted of a felony.

¶ 12    The defense did not present any witnesses. Following closing arguments, the jury found defendant guilty of attempted murder and aggravated battery of Williams, aggravated battery of Logan, and unlawful use or possession of a weapon by a felon. Additionally, the jury found proven that, during the commission of the attempted murder of Williams, defendant personally discharged a firearm that proximately caused great bodily harm to Williams. The jury, however, found defendant not guilty of attempted murder of Logan.

¶ 13    Following the verdicts, defendant filed an unsuccessful motion for new trial. The trial court subsequently merged multiple guilty counts and sentenced defendant to 50 years' imprisonment for attempted murder of Williams, which included a 25-year enhancement for personally discharging a firearm that proximately caused him great bodily harm, 6 years' imprisonment for the aggravated battery of Logan, and 14 years' imprisonment for unlawful use or possession of a weapon by a felon. The court ordered the sentences for attempted murder and aggravated battery to run consecutively while the sentence for unlawful use or possession of a weapon by a felon to run concurrently for a cumulative sentence of 56 years' imprisonment.

¶ 14    This appeal followed.

¶ 15                                        II. ANALYSIS

¶ 16                             A. Sufficiency of the Evidence

¶ 17    Defendant contends that the State failed to present sufficient evidence to convict him of attempted murder of Williams and aggravated battery of Logan where its case was entirely circumstantial, as no one identified him as the shooter, no one identified him as being at the scene of the shooting, and his fingerprints were not found on the recovered firearm.

¶ 18    When a defendant challenges the sufficiency of the evidence against him, we must determine whether, when the evidence is viewed in the light most favorable to the State, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *People v. Woods*, 2023 IL 127794, ¶ 56. A case supported entirely by circumstantial evidence is sufficient to sustain a criminal conviction as long as it meets this standard. *People v. Jackson*, 2020 IL 124112, ¶ 64. "Under this standard of review, it is the responsibility of the trier of fact to fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (Internal quotation marks omitted.) *Id.*

The reviewing court does not retry the defendant, and thus, we do not substitute in our judgment for that of the trier of fact on issues affecting the credibility of witnesses or the weight of the evidence. *Id.* We will not reverse a defendant's conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Id.*

¶ 19    In order to sustain a conviction for attempted murder, the State had to prove beyond a reasonable doubt that "(1) defendant performed an act constituting a substantial step toward the commission of murder, and (2) [he] possessed the criminal intent to kill the victim." *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52. Because intent is a state of mind, it rarely is proven through direct evidence. *Id.* The intent to kill may be inferred through the actions of a defendant, including "the character of the assault, the use of a deadly weapon, and the nature and extent of the victim's injuries." *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 59. Additionally, to support the 25-year firearm enhancement, the State had to prove that, during the attempted murder of Williams, defendant personally discharged a firearm that proximately caused great bodily harm to Williams. See 720 ILCS 5/8-4(c)(1)(D) (West 2016). In order to sustain the conviction for aggravated battery to Logan, the State had to prove beyond a reasonable doubt that defendant, in committing a battery, knowingly discharged a firearm, other than a machine gun or a firearm equipped with a silencer, and caused injury to Logan. 720 ILCS 5/12-3.05(e)(1) (West 2016). A defendant commits a battery when he "knowingly without legal justification by any means *** causes bodily harm to an individual." *Id.* § 12-3(a).

¶ 20    In the instant case, defendant does not contest that the shooter performed an act constituting a substantial step toward the commission of murder or that the shooter possessed the criminal intent to kill Williams. Indeed, the evidence amply demonstrates these elements, as the shooter fired at least 12 gunshots, including reaching over Harris' vehicle and shooting directly at Williams

multiple times. See *People v. Vega*, 2018 IL App (1st) 160619, ¶ 41 ("The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill.") (Internal quotation marks omitted.) Defendant likewise does not dispute that the shooter personally discharged a firearm that proximately caused great bodily harm to Williams, as it is clear from his injuries that he suffered great bodily harm. Williams was shot three times, the police found him covered in blood, he suffered a shattered spine and nerve damage to his left leg, was wheelchair bound for several months and still has a bullet lodged in his right hip. See *People v. Brown*, 2015 IL App (1st) 130048, ¶ 34 (ample evidence to prove that the defendant personally discharged a firearm that proximately caused great bodily harm to the victim where the victim testified, in part, that the "defendant shot him twice, with one of those bullets still lodged in his thigh and causing his leg to go numb and lose feeling"). Furthermore, defendant does not contest that the shooter, in committing a battery, discharged a firearm, other than a machine gun or a firearm equipped with a silencer, and caused injury to Logan. See 720 ILCS 5/12-3(a), 12-3.05(e)(1) (West 2016).

¶ 21    Rather, defendant posits that the State's evidence failed to prove he was the shooter. Admittedly, the State's evidence against defendant was purely circumstantial, as no one identified him as the shooter, but nevertheless, the evidence sufficiently proved beyond a reasonable doubt that he was the shooter. First, after the shooting, Riley observed someone running and ducking into a courtyard. When responding officers followed Riley's prompts about where that person ran, they located defendant who was attempting to hide. See *People v. Pursley*, 284 Ill. App. 3d 597, 606 (1996) (evidence that the defendant was hiding when he knew the police were looking for him was relevant to show his consciousness of guilt). Second, ballistics evidence established that the 12 fired cartridge casings found at the scene of the shooting had been fired from the gun found only six feet away from defendant, thereby linking him to the weapon responsible for the shooting

of Williams and Logan. Third, defendant's hooded sweatshirt tested positive for gunshot residence, which allowed the jury to infer that defendant was the shooter. See *People v. Harris*, 2022 IL App (1st) 192509, ¶ 60 (where gunshot residue was found on the cuffs of a sweatshirt connected to the defendant, that evidence helped prove defendant guilty of first-degree murder and attempted murder). Fourth, even though no one disputes that the police found defendant near the scene of the shooting shortly after the shooting, he attempted to obtain a false alibi from an acquittance, further demonstrating his consciousness of guilt. See *People v. Milka*, 211 Ill. 2d 150, 182 (2004) ("[A] false alibi can be a factor in establishing guilt beyond a reasonable doubt.").

¶ 22    Beyond this evidence, the State presented additional evidence at trial that we cannot review, including various surveillance videos from near the scene of the shooting, because defendant failed to include the trial exhibits in the record on appeal. The appellant, here defendant, has the "burden to present a sufficiently complete record of the proceedings below to support a claim of error." *People v. Deleon*, 227 Ill. 2d 322, 342 (2008). "[I]n the absence of a complete record on appeal, it will be presumed that the order entered by the [trial] court was in conformity with the law and had a sufficient factual basis." *Id.* According to the State's closing argument, that video evidence showed the shooter wearing a hooded sweatshirt, shooting a firearm and running from the scene in the direction where Riley ultimately observed an individual run past. Moreover, according to the State's closing argument, the hooded sweatshirt worn by the shooter in the surveillance video was consistent with the hooded sweatshirt defendant was wearing when found.

¶ 23    In a case built upon circumstantial evidence, the jury does not need to "be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *People v. Galarza*, 2023 IL 127678, ¶ 27. Here, when the

positive gunshot residue test, defendant's act of hiding when being found by the police, his proximity to the firearm determined to be responsible for the shooting based on ballistics evidence and his request for a false alibi are viewed in the light most favorable to the State together with the assumptions we must make based on his failure to present a sufficiently complete record of the proceedings, we cannot find that the evidence against him for being the shooter was so improbable or unsatisfactory that it creates a reasonable doubt of his guilt.

¶ 24    Still, defendant highlights that his fingerprints were not found on the firearm. Although the fingerprint evidence did not pinpoint him as the shooter, it likewise did not exonerate him, as the fingerprint evidence collected was not suitable for comparison. See *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 64 (rejecting a defendant's argument "that the lack of DNA evidence create[d] reasonable doubt that [he] was the shooter" where "although the DNA did not definitively identify defendant as the perpetrator of this offense, it did not exonerate him from it"). Defendant also points out that the police failed to test his hands for gunshot residue. But the State's witnesses explained why they failed to do so, which was testimony for the trier of fact to weigh in conjunction with the right cuff of defendant's hooded sweatshirt testing positive for gunshot residue. See *Jackson*, 2020 IL 124112, ¶ 64. Consequently, the State presented sufficient evidence to prove defendant guilty of attempted murder of Williams, a finding that he personally discharged a firearm that proximately caused great bodily harm to Williams during that attempted murder, and aggravated battery to Logan.

¶ 25    Defendant also challenges the sufficiency of the evidence to prove his conviction for unlawful use or possession of a weapon by a felon. To prove defendant guilty of this offense, the State had to prove he "knowingly possess[ed]" a firearm "about his person" and had been previously convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2016). Defendant concedes that the

State sufficiently proved he had a prior felony conviction, but argues that the State presented no evidence linking him to the firearm.

¶ 26    Possession of a firearm "about" a defendant's person (*id.*) does not require the State to prove an individual had actual possession of the weapon. *People v. Wise*, 2021 IL 125392, ¶ 24. Rather, the State proves that the defendant had a firearm "about his person" through evidence of constructive possession. *Id.* To prove constructive possession, the State must establish that the defendant knew the firearm was present, and he exercised immediate and exclusive control over the area where the firearm was found. *People v. Brown*, 2020 IL 124100, ¶ 11. "Knowledge may be shown by evidence of defendant's acts, declarations, or conduct from which it can be inferred that he knew the handgun existed in the place where it was found." *People v. Anderson*, 2018 IL App (4th) 160037, ¶ 32. "Control may be shown by evidence that defendant had the intent and capability to maintain control and dominion over the handgun, even if he lacked personal present dominion over it." *Id.* These are questions of fact for the trier of fact to resolve. *Id.*

¶ 27    Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt defendant had knowledge of the firearm found six feet from him in a fenced-in area of plants along the walkway leading to the courtyard. The police located defendant and the firearm in the middle of the night, and there was no evidence presented that anyone else was near the location where both were found. See *People v. Eghan*, 344 Ill. App. 3d 301, 308 (2003) (constructive possession of narcotics supported by evidence that only the defendant "was observed near the area where the cocaine was found"). These discoveries were supported by a positive gunshot residue test from which the jury could reasonably infer that the firearm was defendant's. Moreover, as discussed earlier, during closing argument, the State argued that the video evidence showed the shooter firing a gun with a hooded sweatshirt consistent to the

one defendant was found wearing. Again, we cannot review this video because of defendant's failure to include it in the record on appeal. Thus, "[a]ny doubts arising from the incompleteness of the record will be construed against the appellant and in favor of the judgment rendered in the lower court." *People v. Henderson*, 2011 IL App (1st) 090923, ¶ 45. Based on the surveillance video in conjunction with defendant's proximity to the recovered firearm and the positive gunshot residue test, the jury could rationally find that defendant ditched the firearm in the fenced-in area of plants before hiding, thereby proving his constructive possession of the weapon. See *Anderson*, 2018 IL App (4th) 160037, ¶¶ 33-34 (sufficient evidence of constructive possession of a firearm where the weapon was found mere feet from the defendant in a yard where no one else was present). Consequently, the State presented sufficient evidence to prove defendant guilty of unlawful use or possession of a weapon by a felon.

¶ 28                                   B. Chain of Custody

¶ 29    Defendant next contends that the State failed to prove chain of custody for the admission of the gunshot residue test result. Defendant highlights that, during trial, the State handed Ellen Chapman, a forensic scientist with the Illinois State Police who testified as an expert in the field of microscopic and trace analysis, People's Exhibit No. 51, which was the hooded sweatshirt. Chapman described the exhibit as "a black and gray fleece jacket" but noted there was "a pair of disposable gloves that weren't there before." Defendant posits that, because gloves from an unknown source were commingled with the hooded sweatshirt, the chain of custody had been broken and the positive gunshot residue test result testified to by Chapman should not have been admitted into evidence.

¶ 30    Defendant concedes that he failed to object to the alleged break in the chain of custody at trial, which results in him forfeiting review of the claim of error on appeal. See *People v.*

*Thompson*, 238 Ill. 2d 598, 611 (2010) ("To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion."). When a defendant forfeits a claim of error, we will only consider the claim if the error was a plain error. *Id.* The plain-error doctrine "bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances." *Id.* at 613. The doctrine applies when a clear or obvious error has occurred, and either: (1) "the evidence [was] so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error" or (2) the "error [was] so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Belknap*, 2014 IL 117094, ¶ 48. In a plain-error analysis, the first step is determining whether a plain or obvious occurred. *Thompson*, 238 Ill. 2d at 613.

¶ 31    Certain types of evidence do not need a chain of custody established before they can be admitted into evidence. *People v. Woods*, 214 Ill. 2d 455, 466 (2005). "[W]here an item has readily identifiable and unique characteristics, and its composition is not easily subject to change, an adequate foundation is laid by testimony that the item sought to be admitted is the same item recovered and is in substantially the same condition as when it was recovered." *Id.* But where evidence is "not readily identifiable or may be susceptible to tampering, contamination or exchange *** , the State is required to establish a chain of custody." *Id.* at 467. This chain of custody must be "sufficiently complete to make it improbable that the evidence has been subject to tampering or accidental substitution." *People v. Trice*, 2017 IL App (1st) 152090, ¶ 61. As a general matter, our courts have identified three kinds of evidence that fall into this category: ballistic evidence, drug evidence and biological evidence. *People v. Wilson*, 2017 IL App (1st)

143183, ¶ 26 (citing cases). Conversely, this court has found that articles of clothing are not susceptible to tampering. *Id.* ¶ 27.

¶ 32 Although not argued explicitly, defendant's argument seems to be that gunshot residue is evidence subject to tampering akin to ballistic evidence, drug evidence and biological evidence such that the State was required to establish a chain of custody sufficient to show it was improbable that the evidence had been subject to tampering. *Id.* ¶ 26; *Trice*, 2017 IL App (1st) 152090, ¶ 61. Although the State has this burden, it does not require the State to present evidence from every person involved in the chain or exclude every possibility of contamination or tampering. *Woods*, 214 Ill. 2d at 467. Instead, the State merely needs to show that it took reasonable protective measures after the item was seized and that it was probable the evidence was not altered in any material respects. *People v. Lach*, 302 Ill. App. 3d 587, 594 (1998). " 'Once the State has established the probability that the evidence was not compromised, and unless the defendant shows actual evidence of tampering or substitution, deficiencies in the chain of custody go to the weight, not admissibility, of the evidence.' " *Woods*, 214 Ill. 2d at 467 (quoting *People v. Bynum*, 257 Ill. App. 3d 502, 510 (1994)).

¶ 33 Neither party cites any cases involving gunshot residue tests and potential contamination, and we likewise have not uncovered any published Illinois decision on point. However, *United States v. Lee*, 502 F.3d 691 (7th Cir. 2007) is illustrative, and because "the Federal Rules of Evidence largely mirror the Illinois Rules of Evidence with regard to the foundation that must be laid for expert witness testimony," the decision is persuasive authority *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 129 n.2.

¶ 34 In *Lee*, 502 F.3d at 697, the defendant contended that the trial court erred in admitting his jacket into evidence, which formed the basis for a gunshot residue expert's testimony of gunshot

residue being found on the jacket's cuff. The evidence showed that the defendant's jacket had been placed into a bag at the jail that was "reused from one inmate to the next without being sterilized or laundered between each use." *Id.* The defendant posited that gunshot residue could have been transferred to his jacket and argued the government failed to take the necessary precautions to preserve the jacket's original condition. *Id.* The Seventh Circuit Court of Appeals rejected the argument and concluded that such arguments about the chain of custody and possible contamination went to the weight of the evidence, not the admissibility. *Id.* at 698. The court therefore found that the gunshot residue evidence from the defendant's jacket was admissible. *Id.*

¶ 35    In the instant case, at trial, Detective Abuzanat testified that he collected and inventoried defendant's hooded sweatshirt using appropriate procedures. Chapman testified that when she first received People's Exhibit No. 51, it was sealed and the garment was the only item in the evidence bag. Thus, the State showed that it took reasonable protective measures after the hooded sweatshirt was seized and that it was probable the evidence was not altered in any material respects. See *Lach*, 302 Ill. App. 3d at 594. And because defendant has not demonstrated actual evidence of contamination (see *Woods*, 214 Ill. 2d at 467), just as in *Lee*, 502 F.3d at 698, the potential contamination based on the gloves being found in the evidence bag went to the weight of the evidence, not the admissibility. Being a question of the weight afforded to evidence, it was within the purview of the jury to resolve. See *Jackson*, 2020 IL 124112, ¶ 64. Consequently, there was no error in allowing the gunshot residue test result into evidence and necessarily no plain error concerning Chapman's testimony about the result. See *Thompson*, 238 Ill. 2d at 613.

¶ 36    Defendant further claims there was a violation of the chain of custody for the firearm. According to defendant, "the photo of the gun retrieved and admitted into evidence," *i.e.*, People's

Exhibit No. 15, "depicted a silver gun" whereas the firearm claimed to be recovered by the police, *i.e.*, People's Exhibit No. 17A, was black.

¶ 37 During trial, Officer Ward described the firearm recovered from the fenced-in area of plants as being a "black handgun." He also identified and described People's Exhibit No. 15 as being a photograph of a "black handgun." Despite defendant's assertion to the contrary, we have no way to address the validity of his claim that People's Exhibit No. 15 actually depicted a silver firearm. As previously noted, the appellant, here defendant, has the "burden to present a sufficiently complete record of the proceedings below to support a claim of error." *Deleon*, 227 Ill. 2d at 342. "[I]n the absence of a complete record on appeal, it will be presumed that the order entered by the [trial] court was in conformity with the law and had a sufficient factual basis." *Id.* As discussed multiple times already, defendant has failed to include the exhibits, including People's Exhibit No. 15, admitted into evidence in the record on appeal. Following defendant's trial, the trial court ordered all of the exhibits to be impounded by the Clerk of the Circuit Court pending the court's further order. These exhibits were available to be included in the record on appeal yet defendant failed to follow the proper procedures to have them included. Consequently, we have no basis to find a chain of custody violation for the firearm.

¶ 38                                  C. Closing Argument

¶ 39 Defendant next contends that, during the State's closing argument, it violated his right against self-incrimination by allegedly referencing his failure to testify. According to defendant, the State repeatedly referenced defendant not acting like a witness, which directly implicated him not testifying at trial. Defendant acknowledges that he failed to object to the alleged improper argument by the State at trial, resulting in him forfeiting review of the claim of error on appeal. See *Thompson*, 238 Ill. 2d at 611. As such, defendant's claim of error can only succeed if he

demonstrates plain error. *Id.* As previously discussed, the first step is determine whether a plain or obvious occurred. *Id.* at 613.

¶ 40    Prosecutors generally have wide latitude in closing arguments and may comment on the evidence and any reasonable inferences therefrom, even if those inferences reflect negatively on the defendant. *People v. Perry*, 224 Ill. 2d 312, 347 (2007). However, because a defendant has the constitutional right not to testify, "the prosecutor is forbidden to make direct or indirect comment on the exercise of that right." *People v. Arman*, 131 Ill. 2d 115, 125-26 (1989). The test is "whether the reference [was] intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify." (Internal quotation marks omitted.) *Id.* at 126. We consider statements in the context of the closing arguments as a whole instead of examining the contested phrases in a vacuum. *Perry*, 224 Ill. 2d at 347.

¶ 41    In the instant case, during the defense's closing argument, defense counsel explained defendant's actions of running and hiding, asserting that he was a bystander attempting to run away and hide from the gunfire like anyone else would. As a corollary to this argument, defense counsel posited that someone else left the firearm in the fenced-in area leading to the courtyard. In rebuttal argument, the State posited that defendant was the individual who left the firearm in the fenced-in area before he attempted to hide from the police. The State acknowledged defense counsel's argument of defendant merely being a witness and asserted: "You know who wasn't acting like a witness that night? Clarence Dunner." The State added:

"Witnesses, when they see the police come to the scene, say, 'Hey, I think the shooter went that way. Maybe you should follow him.' Witnesses come and give their name and come out of their building. Witnesses don't crouch behind a wall and put their hands over their face. Witnesses don't duck, and move, and bob and

weave their body while the police are trying to conduct further investigation at the scene *** Witnesses don't pretend like their legs don't work while they're at the police station so that they can be taken to the hospital. Guilty defendants do that. That's what the defendant did on June 2nd."

¶ 42    Here, the State's rebuttal argument was in direct response to defense counsel's argument that defendant's behavior could be explained by him being nothing more than a bystander of the same shooting that injured Logan and Williams. In responding to defense counsel's argument, the State used the evidence, or reasonable inferences therefrom, to juxtapose defendant's conduct with the conduct of an innocent bystander and argue that they were incompatible. See *People v. Hudson*, 157 Ill. 2d 401, 441 (1993) (asserting that "[t]he prosecutor may also respond to comments by defense counsel which clearly invite a response"). Although defendant attempts to portray the State's argument as referencing his failure to testify at trial, a review of the comments reveals no such implication. Moreover, in arguing that the State improperly referenced his failure to testify, defendant repeatedly highlights the State's argument where it allegedly asserted: " 'Witnesses come and go, none came out of this building.' " Defendant takes this comment to mean the building where his trial occurred. However, we cannot find such a remark made by the State. The closest remark we can find was when the State asserted: "Witnesses come and give their name and come out of their building." And, as previously discussed, such a comment was appropriate. Consequently, the State's argument was proper, and therefore, no plain error occurred. See *Thompson*, 238 Ill. 2d at 613.

¶ 43    Defendant additionally posits that the trial court had a duty to *sua sponte* object to the State's allegedly improper reference to his failure to testify. However, because the State's remarks were proper, assuming *arguendo* that such a duty existed, there was no basis for an objection.

¶ 44                        D. Facts Not in Evidence

¶ 45    Defendant next contends that, during closing argument, the State argued facts not in evidence. Defendant highlights the State's comment that: "Witnesses don't pretend like their legs don't work while they're at the police station so that they can be taken to the hospital." In making this contention, defendant fails to acknowledge that he did not object to this remark during the State's closing argument, thereby forfeiting review of the claim of error on appeal. See *Thompson*, 238 Ill. 2d at 611. As such, defendant's claim of error can only succeed if he demonstrates plain error. *Id.* However, a defendant can also forfeit plain-error review. *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010). This is because, under the doctrine, the defendant has the burden of persuasion to show plain error occurred. *Thompson*, 238 Ill. 2d at 613. "A defendant who fails to argue for plain-error review obviously cannot meet his burden of persuasion." *Hillier*, 237 Ill. 2d at 545. Defendant has not argued for plain-error review of this claim of error and therefore, he forfeited plain-error review. See *id.* at 547. Consequently, we do not address the merits of this contention.

¶ 46                    E. Ineffective Assistance of Counsel

¶ 47    Lastly, defendant contends that his defense counsel provided ineffective assistance where counsel failed to file a motion to quash his arrest and suppress the evidence therefrom. Defendant posits that, had counsel filed such a motion, the motion would have been successful because the police lacked probable cause to arrest him where they merely found him hiding in a courtyard with a firearm in close proximity. According to defendant, because the motion would have been successful, the fruits of his illegal arrest, including the result of the gunshot residue test, would have been excluded, ultimately resulting in nothing linking him to the shooting.

¶ 48    The United States and Illinois Constitutions guarantee a defendant the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. When evaluating

claims of ineffective assistance of counsel, the defendant must satisfy the two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Gayden*, 2020 IL 123505, ¶ 27. Under the test, the defendant must establish that his counsel's performance was deficient and the deficient performance prejudiced him. *Strickland*, 466 U.S. at 687. Specific to a claim of ineffective assistance of counsel for failing to file a motion to quash arrest, to show prejudice, the defendant must establish "a reasonable probability that: (1) the motion would have been granted, and (2) the outcome of the trial would have been different had the evidence been suppressed." (Internal quotation marks omitted.) *People v. Givens*, 237 Ill. 2d 311, 331 (2010). The defendant must prove both prongs of the *Strickland* test to be successful. *Gayden*, 2020 IL 123505, ¶ 27. We review whether the defendant received ineffective assistance of counsel *de novo*. *People v. Johnson*, 2021 IL 126291, ¶ 52. Because both prongs of the *Strickland* test must be met, we may analyze them in any order. *People v. Kirklin*, 2015 IL App (1st) 131420, ¶ 109.

¶ 49     We begin with the prejudice prong because if filing a motion to quash arrest would have been futile, defense counsel cannot be deemed ineffective for failing to file it. See *Givens*, 237 Ill. 2d at 331. In order to make a warrantless arrest, the police need probable cause. *People v. Grant*, 2013 IL 112734, ¶ 11. "Probable cause to arrest exists when the facts known to the officer at the time of the arrest are sufficient to lead a reasonably cautious person to believe that the arrestee has committed a crime." *Id.* Whether probable cause exists depends on the totality of the circumstances at the time of arrest. *Id.* "Whether probable cause exists is governed by commonsense considerations, and the calculation concerns the probability of criminal activity, rather than proof beyond a reasonable doubt." *Id.* Although the police need to have more than a mere suspicion, they do not need evidence sufficient to convict the defendant of a crime. *People v. Marcella*, 2013 IL App (2d) 120585, ¶ 28. "The difficulty of establishing probable cause is lessened when it is known

that a crime has been committed." *People v. Hopkins*, 235 Ill. 2d 453, 476 (2009). Further, "when officers are working in concert, *** probable cause can be established from all the information collectively received by the officers even if that information is not specifically known to the officer who makes the arrest." *People v. Maxey*, 2011 IL App (1st) 100011, ¶ 54.

¶ 50    Initially, we note that, in a warrantless arrest situation, a preliminary inquiry often is when the police actually arrested the defendant. See *In re D.G.*, 144 Ill. 2d 404, 409 (1991). "An arrest occurs when the circumstances are such that a reasonable person, innocent of any crime, would conclude that he was not free to leave." *Id.* In this case, there are two potential times the police arrested defendant. Defendant claims that the police arrested him after finding him hiding in the courtyard and discovering the firearm, a claim the State does not contest. Indeed, the police handcuffed defendant shortly after they discovered him hiding. However, at trial, the police testified that defendant was merely detained at this point. An officer may "briefly stop a person for temporary questioning if the officer has knowledge of sufficient articulable facts at the time of the encounter to create a reasonable suspicion that the person in question has committed or is about to commit a crime." *People v. Lee*, 214 Ill. 2d 476, 487 (2005) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)). And merely because officers handcuff a suspect during a *Terry* stop does not turn that encounter into an arrest requiring probable cause. See *People v. Colyar*, 2013 IL 111835, ¶ 47 (observing that "handcuffing does not automatically transform a *Terry* stop into an illegal arrest" and "the propriety of handcuffing during a *Terry* stop depends on the circumstances"). Following a *Terry* stop, the police may develop additional facts that then provide probable cause to arrest an individual. See *People v. Allen*, 409 Ill. App. 3d 1058, 1075 (2011). To this end, at trial, the police claimed that they arrested defendant after they conducted a show-up with defendant. Part of the issue in determining when defendant was arrested is that the parties did not litigate the motion

below, meaning all the facts necessary for a probable cause determination may not have been fully explored at trial. See *People v. Henderson*, 2013 IL 114040, ¶ 22 (observing that where a "defendant's claim of ineffectiveness is based on counsel's failure to file a suppression motion, the record will frequently be incomplete or inadequate to evaluate that claim because the record was not created for that purpose"). However, regardless of the two potential times of arrest, the police had probable cause to do so.

¶ 51    Assuming *arguendo* that the police arrested defendant after the show-up, there was probable cause to arrest him, in large part due to the positive identification of defendant by eyewitness John Williams, who passed away by the time of defendant's trial. Before trial, pursuant to a motion *in limine* filed by defendant, the trial court deemed Williams' testimony inadmissible at trial as testimonial hearsay under the sixth amendment's confrontation clause. See U.S. Const., amend. VI; *People v. Leach*, 2012 IL 111534, ¶ 63. Although that evidence was inadmissible at trial, it would have likely been admissible to support a probable cause determination at a suppression hearing because the normal rules of evidence do not apply at such hearings, meaning "hearsay evidence is admissible even though it is not admissible at trial." *People v. Patterson*, 192 Ill. 2d 93, 111-12 (2000); see *In re Kendale H.*, 2013 IL App (1st) 130421, ¶ 30 ("In deciding the [suppression] motion, the normal rules of evidence do not apply and the trial court may consider hearsay evidence that would not be admissible at trial."); see also *Barber v. Page*, 390 U.S. 719, 725 (1968) (explaining that "[t]he right to confrontation is basically a trial right"); *Ebert v. Gaetz*, 610 F.3d 404, 414 (7th Cir. 2010) (finding the defendant's right to confrontation "not implicated" at a suppression hearing). And thus, based on Williams' identification of defendant as the shooter along with the other circumstances, including defendant's proximity to the scene of the shooting only minutes after the shooting, the police would have had probable cause to arrest defendant under

this scenario. See *In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 121 (probable cause existed, in part, where the suspect was arrested near the scene of a robbery shortly after it was committed and was identified as the perpetrator of the offense in a show-up).

¶ 52    Assuming *arguendo* that the police arrested defendant only after they found him hiding in a courtyard with a firearm in close proximity, there still would have been probable cause to arrest him. When the police responded to the scene, they knew a shooting had just occurred. According to Officer Vo, the initial description of the shooter was a male black with a blue hooded sweatshirt. According to Officer Stranski, he was pointed toward a location where Riley had just seen a man running. As Officer Stranski and other officers converged on that location, they found defendant, who no one disputes was a black male, wearing a hooded sweatshirt. See *People v. McGee*, 373 Ill. App. 3d 824, 831-32 (2007) (probable cause to arrest existed, in part, where the "defendant matched a general description as provided to the police officers" and he "was the only person in the area that matched that description"). Moreover, the police found defendant crouching down and attempting to hide his face in the courtyard behind a locked wrought iron fence. See *People v. Ruppel*, 303 Ill. App. 3d 885, 890 (1999) (observing that attempts to hide from the police are a factor in support of probable cause). Furthermore, the police found defendant near the scene of the shooting immediately after it occurred. See *In re Edgar C.*, 2014 IL App (1st) 141703, ¶ 121 (finding probable cause supported by the defendant's "physical proximity to the crime scene, and the short time that elapsed since the offense"). The police also found defendant only six feet away from a firearm secreted in a garden area when the offense in question was a shooting. See *People v. Adams*, 404 Ill. App. 3d 405, 416 (2010) (probable cause to arrest the defendant for a weapons offense, in part, upon an officer's "discovery of the rifle beneath [a] bush *** in close proximity to where [the] defendant was standing when the officers arrived"). Taken together, especially in

light of the fact the police knew a crime had just been committed (see *Hopkins*, 235 Ill. 2d at 476), these facts would have been sufficient to lead a reasonably cautious person to believe that defendant had committed a crime. See *Grant*, 2013 IL 112734, ¶ 11. Therefore, the police would have had probable cause to arrest him under this scenario.

¶ 53    Based on the police having probable cause to arrest defendant under either scenario, had defense counsel filed a motion to quash his arrest and suppress the evidence therefrom, there is not a reasonable probability that the motion would have been granted. See *Givens*, 237 Ill. 2d at 331. As such, filing the motion would have been futile. "[T]he failure to file a motion to suppress *** does not establish incompetent representation when it turns out that the motion would have been futile." *Id.* Consequently, defendant's ineffective assistance of counsel claim fails.

¶ 54                                    III. CONCLUSION

¶ 55    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 56    Affirmed.